IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

LETITIA WILBOURN, INDIVIDUALLY AND
AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF DUQUAN MYERS, DECEASED,

  Plaintiff,

v.                                                    No. 4:19-cv-0263-P

BRG SPORTS, INC., AND RIDDELL, INC.,

  Defendants.

**MEMORANDUM OPINION & ORDER**

Over the past few decades, football has arguably passed baseball as "America's Pastime."[1] Eight of the ten most watched telecasts in 2020 were football games, and nearly a third of the country watched Super Bowl LIV live. Michael Schneider, *Year in Review: Top Rated Shows of 2020*, VARIETY, https://variety.com/2020/tv/news/top-rated-shows-2020-jeopardy-ncis-oscars-masked-singer-super-bowl-1234866838/ (last visited Oct 19, 2020). Over a million high school students played competitive tackle football during the 2018–2019 school year. *See*

---

[1]Indeed, no less an American hero than General Douglas MacArthur described the game of football in a 1959 speech as a

> symbol of our country's best qualities—courage, stamina, coordinated efficiency. Many even believe in these cynical days of doubt and indecision that through this sport we can best keep alive the spirt of virility and enterprise which has made us great.

Douglas MacArthur, General of the Army, Football is a Symbol of Our Country's Best Qualities, Address at the National Football Foundation Annual Awards Dinner (Dec. 1, 1959), *in* A SOLDIER SPEAKS: PUBLIC PAPERS AND SPEECHES OF GENERAL OF THE ARMY DOUGLAS MACARTHUR 339 (Maj. Vorin E. Whan, Jr., ed., 1st ed. 1965).

*generally 2018–19 High School Athletics Participation Survey*, NAT. FED'N OF STATE HIGH SCH. ASSOC. (2019). However, despite its importance and popularity, serious questions have been raised about tackle football's safety. Congress investigated links between the game and Chronic Traumatic Encephalopathy ("CTE") through roundtable testimony of medical experts and the National Football League, with some witnesses testifying that tackle football may be unsafe to play at certain ages. *See Concussion Research and Treatment: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 114th Cong. (2016); *Youth Sports Concussions: Hearing Before the Subcomm. on Oversight and Investigations of the H. Comm. on Energy and Commerce*, 114th Cong. (2016). CTE remains at the cultural forefront of any discussion about player health and safety. *See, e.g.*, KILLER INSIDE: THE MIND OF AARON HERNANDEZ (Netflix 2020).

While the Court has grave concerns about the long-term effects of CTE and desires to protect players, especially youth who may not fully understand the risks of the game, the Court is bound to follow the law and the evidence that is brought before it.[2] Before the Court is Defendants' BRG Sports, Inc. and Riddell, Inc., ("Riddell") Motion for Summary Judgment (ECF No. 67). Having

---

[2]The Court is reminded of the words of the celebrated Virginia jurist Brockenbrough Lamb who observed in a similar tragic case several decades ago that although he

> regret[ed] that the conclusion reached will prevent a recovery and may thereby defeat the ends of justice in the particular case before [the court], but however that may be, *we must declare the law as we find it written and comfort ourselves with the confident belief that in its results it will promote the ends of justice to all.*

Judge Brockenbrough Lamb, *The Duty of Judges: A Government of Laws and Not of Men, in* HANDBOOK FOR JUDGES 93 (Donald K. Carroll ed., 1961) (emphasis added).

consider the Motion, Response (ECF No. 80), and Reply (ECF No. 85), and despite the tragic underlying facts, the Court concludes that the Motion for Summary Judgment should be **GRANTED**.

## BACKGROUND

**A. Wilbourn's Underlying Claims**

Plaintiff Letitia Wilbourn's son, DuQuan Myers, was a former high school football player. Pl.'s Compl. at 2, ¶ 3, ECF No. 1. Wilbourn alleges that Myers wore a Riddell football helmet and suffered at least 14 concussions. *Id.* Tragically, in 2017, Myers committed suicide. *Id.* After his death, Wilbourn submitted his brain to the Boston University School of Medicine's Chronic Traumatic Encephalopathy Center. *Id.* The Center examined Myers's brain and diagnosed him with depression and post concussive syndrome. Mez Report, App 84, ECF No. 84. The Center noted that Myers's depressive symptoms were amplified after the death of his cousin and the ending of a romantic relationship. *Id.*

Representing Myers's estate, Wilbourn sued Riddell for: (1) wrongful death; (2) negligence; (3) design defect; and (4) failure to warn. Pl's. Compl. at 40–47. Wilbourn alleges that Myer's CTE was caused by concussions he sustained from playing football, and that the CTE, at least in part, was the cause of Myers's death. Pl.'s Compl. at 2, ¶ 3. Wilbourn alleges that because helmets are responsible for protecting against long-term brain injuries by absorbing the energy from impact, a poorly-designed helmet will not provide sufficient protection. *Id.* at 19, ¶ 71. She further alleges that Riddell intentionally mislead football players by misrepresenting how effective their helmets are at preventing concussions and protecting against brain injuries. *Id.* at 20, ¶ 75. She also alleges that Riddell inadequately warned of the dangers

3

associated with concussions. *Id.* at 30, ¶¶ 111–12. Wilbourn alleges Myers suffered from concussions and sub-concussive hits while playing football and that these hits caused brain injuries had long-term effects. *Id.* at 7, ¶ 23; 10, ¶ 34; 11, ¶¶ 35–36. Finally, she alleges that the long-term effects of these injuries include brain degeneration, aggression, depression, and progressive dementia. *Id.* at 12, ¶ 42.

In support of her claims, she designated two testifying expert witnesses: Dr. Randall Benson, a medical expert on brain trauma to testify about CTE, and Dr. Michael Motley,[3] a professor of communication to testify about the adequacy of Riddell's warnings; and two non-testifying expert witnesses: Dr. Jesse Mez and Dr. Bertrand Huber; two doctors involved in the examination of Myers's brain at Boston University.

## B. The Testimony of the Experts

### 1. Dr. Randall Benson's Expert Report

Dr. Randall Benson is a testifying expert as to the general and specific causation issues of Wilbourn's wrongful death and products liability claims. Pl. App. of Resp. to Defs.' Mot. for Summ. J., Benson's Report, App 2, ¶ 1, ECF No. 84. Dr. Benson's report has two main subjects: the medical explanation of brain injuries and the relationship between brain injuries and football. The first section begins by explaining what concussions are, what causes them, and their possible long-term effects. *See generally* Benson Report at App 5. The report details that concussions are caused by bruising to the brain and that a person suffering a concussion can temporarily lose normal brain function. *Id.* ¶ 13. The report also links concussions to CTE, which is a "progressive neurodegenerative disease caused by repetitive trauma to the

---

[3]Dr. Motley's testimony was excluded because it failed to meet the *Daubert* test. *See* Order Excluding Expert Testimony, ECF No. 92.

4

brain" with "symptoms similar to Alzheimer's disease." *Id.* ¶¶ 15, 19–20. Finally, the report lays out the physiological effects of head impacts and how the protein deposits related to brain trauma, called tau, are linked to CTE. *Id.* ¶¶ 27–28. As the basis for this section, Dr. Benson relies on his expertise as a neurologist and several articles, including a study performed by Boston University's Center for the Study of Chronic Traumatic Encephalopathy.

The second subject states that head impacts while playing football are linked to the risk of permanent brain injury. *Id.* ¶ 28. The report then discusses the role that helmets play in protecting against the occurrence of traumatic brain injury and death. *Id.* ¶ 30–31. It explains how helmets and other protective headgear can reduce the potential for harm by "reducing the acceleration of the head on impact" by "compressing to absorb force . . . and slowly restoring to its original shape." *Id.* at 32. The report approves helmets for their ability to "mediate" high-impact collisions but questions the extent that helmets can mitigate the effect of other forces or types of collisions. *Id.* at 33. The only mention of helmet design comes in the last two paragraphs of the report which finds that a poorly designed helmet may increase the risk of brain injury and that a properly designed helmet can reduce this risk. *Id.* at 34–35. In this section, Dr. Benson cites only one study for the proposition that a helmet can mitigate the occurrence of brain injury. *Id.* ¶ 31.

2. <u>Post-Mortem Reports of Dr. Jesse Mez and Dr. Bertrand Huber</u>

Dr. Mez and Dr. Huber are both medical doctors at Boston University's Chronic Traumatic Encephalopathy Center. Pl. App. of Resp. to Defs.' Mot. for Summ. J., Mez Report, App 82; Huber Report, App 84. Neither have been retained as at testifying witness. Each prepared a report in conjunction with a university

5

study to learn more about CTE after Myers's brain was donated. *Id.* Each report is brief, only one paragraph. *Id.*

Dr. Mez prepared a clinical report that was approved by the university's study panel. *Id.* The report summarized Myers's background, including his history playing football, his reported concussions, and his death. Mez Report, App. 82. The report recited Myers's symptoms, including sensitivity to light and depression. *Id.* The report found that depression was the primary diagnosis for his death, and that "post-concussive syndrome" was a contributing diagnosis. *Id.*

Dr. Huber prepared a neuropathology report that diagnosed Myers with CTE, indicating a tau deposition pattern consistent with CTE stage I/IV. Huber Report, App. 84. The report noted the damage from the gunshot wound and found damage associated with "a history of traumatic brain injury." *Id.* The report did not find evidence of Lewy Body disease. *Id.* No further information was provided in these reports and neither Dr. Mez nor Dr. Huber were deposed.

## PROCEDURAL HISTORY

After the parties engaged in discovery, Defendants moved to exclude the experts' testimony, arguing that under Federal Rule of Evidence 702, the proposed testimony fails to meet the indicia of reliability and relevancy required for its admission. ECF Nos. 70, 72, 74. Wilbourn opposed these motions. ECF Nos. 81, 82, 83. The Court denied Defendants' motions as to Drs. Benson, Mez and Huber, however, the Court excluded Dr. Motley's testimony. Order Excluding Dr. Motley, ECF No. 92. Defendants simultaneously moved for summary judgment, which Wilbourn opposed. Defs.' Mot. for Summ. J.; Pl.'s Resp. to Defs.' Mot. for Summ. J., ECF No. 80.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, admissions, disclosure materials on file, and affidavits, if any, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c)(1). A fact is material if the governing substantive law identifies it as having the potential to affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.¸* 477 U.S. 242, 248 (1986). While the moving party "must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case." *Duffie v. United States¸* 600 F.3d 362, 371 (5th Cir. 2010). An issue as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To demonstrate a genuine dispute as to the material facts, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 586 (1986). The nonmoving party must show that the evidence is sufficient to support the resolution of the material factual issues in their favor. *Anderson¸* 477 U.S. at 249 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)).

When evaluating a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). However, it is not the Court's duty to comb through the record in search of evidence that creates a genuine dispute as to a matter fact. *See Malacara v. Garber¸* 353 F.3d 393, 405 (5th Cir. 2003). The nonmoving party bears the responsibility of designating evidence in the record that establishes the existence of a genuine dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "When evidence exists in the summary judgment record

but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly" before the Court. *Malacara*, 353 F.3 at 405.

## ANALYSIS

Defendants move for summary judgment on the grounds that Wilbourn has not presented sufficient evidence to establish that their helmets caused Myers's death. Defs.' Mot. for Summ. J. at 13, ECF No. 67. Defendants also assert two affirmative defenses, the statute of limitations and lack of capacity to pursue claims, as justification for summary judgment. *Id.* at 25. The Court addresses Defendants' affirmative defenses first.

**A. Defendants' affirmative defenses preclude Wilbourn's claims.**

Defendants raise two affirmative defenses to Wilbourn's claims; each defense is applicable to different claims. Defendants assert that her claims for wrongful death are barred by the statute of limitations. Defs.' Br. in Supp. of Mot for Summ. J. at 25, ECF No. 68. Defendants also assert that Wilbourn lacks the capacity to bring any claims on behalf of Myers's estate which survive his death, i.e., the claims for negligence, design defect, and failure to warn. *Id.* at 26. These defenses, if established, negate Wilbourn's claims and entitle Defendants to summary judgment.

1. <u>The statute of limitations bars Wilbourn's wrongful death claim.</u>

Defendants assert that Wilbourn's wrongful death claim is barred by the statute of limitations. Defs.' Br. in Supp. of Mot for Summ. J. at 25. The statue of limitations for a wrongful death claim is two years after the day the cause of action accrues. TEX. CIV. PRAC. & REM. CODE § 16.003(b). A wrongful death claim accrues on the death of the injured person. *Id.* By Wilbourn's own admission, Myers's death occurred on February 17, 2017 and the

8

complaint was not filed until March 31, 2019, after the two-year period. Pl.'s Resp. to Defs.' Motion for Summ. J. at 14, ECF No. 80. Therefore, the statute of limitation has expired.

To save her wrongful death claim, Wilbourn asserts that the statute of limitations was tolled by the filing of a class action in Illinois. *Id.* at 14; *see generally Adams v. BRG Sports, Inc.*, 2021 WL 1517881 (N.D. Ill. Apr. 17, 2021). Wilbourn argues Myers's claims are nearly identical to the claims in the class action, so the statute of limitations should be tolled under the *American Pipe* doctrine. *Id.* In *American Pipe & Construction v. Utah*, the Supreme Court held the "commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties" to the suit if the case continued as a class action. 414 U.S. 538, 554 (1974). This tolling preserves potential class members' claims without requiring them to join the proceedings. *Id.* at 553–54. This holding came in the context of a federal claim in a federal class action. *Id.* at 560–61. However, Wilbourn's wrongful death and survival claims are state law creations, not federal law. Thus, the rules for tolling state law claims are based on state law, not federal law. *Newby v. Enron Corp.*, 542 F.3d 463, 472 (5th Cir. 2008).

Wilbourn states that the Fifth Circuit "has not weighed in on the applicability of *American Pipe*" to cross-jurisdictional tolling in personal injury class action claims. Pl.'s Resp. to Defs.' Mot. for Summ. J. at 16. But the Fifth Circuit determined that Texas courts do not extend the *American Pipe* holding "to allow a federal class action to toll a state statute of limitations." *Newby*, 542 F.3d at 472. While Texas does allow for the tolling of claims when a state class action is filed, it is limited to a state class action raising "property damage-type claims" and it does not extend to federal claims. *Id.* As the Fifth Circuit explained, "it is unclear whether, under this rule, a federal class action filed in Texas or in any other

9

State would ever toll a Texas statute of limitations regardless of the claims raised." *Id.* (quoting *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1147 (5th Cir. 1997)).

Wilbourn's tolling argument is based on a federal class action filed in a different state, raising personal injury negligence claims. *See generally Adams*¸ 2021 WL 1517881, at * 1-4. . She relies on precedent applying *American Pipe* tolling to federal class actions asserting federal claims to assert a "bright line rule." Pl.'s Resp. at 13 (citing *Hall v. Variable Annuity Life Inc. Co.*, 727 F.3d 372, 375 (5th Cir. 2013)). But *Newby* is clear: Texas does not recognize this cross-jurisdictional class action tolling.

Wilbourn also asserts Defendants' fraudulent concealment of wrongdoing tolls the statue of limitations. Pl.'s Resp. at 18. The statute of limitations does not begin to run against a claimant when a "defendant has fraudulently concealed the facts forming the basis of the plaintiff's claim" until the plaintiff should have discovered the injury "using reasonable diligence." *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 750 (Tex. 1999). Wilbourn bears the burden "to come forward with summary judgment evidence raising a fact issue on each element of the fraudulent concealment defense." *Id.* at 749–50. But she does not point to any evidence that supports her claim. Instead, she relies, at most, on her pleadings. *See* Pl.'s Resp. at 18–19.

On the contrary, Wilbourn immediately requested to donate Myers's brain to CTE researchers after his death, indicating she had notice of facts forming the basis of her claim then. In the absence of any evidence showing fraud or concealment of facts, the statute of limitations cannot be tolled. Because the statute of limitations has run on Wilbourn's wrongful death claim and no tolling is applicable, her claim is barred. Accordingly, Defendant's Motion for Summary Judgment on Wilbourn's wrongful death claim is **GRANTED.**

2. <u>Wilbourn does not have capacity to pursue Myers's surviving claims.</u>

Wilbourn's remaining three claims are on behalf of Myers's estate. A personal injury claim does not abate upon the injured person's death; the claim survives and may be brought by "the heirs, legal representatives, and estate of the person." TEX. CIV. PRAC. & REM. CODE § 71.021. A plaintiff must have capacity, or the "legal authority" to litigate, to bring a lawsuit and "generally, only the estate's personal representative has the capacity to bring a survival claim." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848, 850 (Tex. 2005). The defendant bears the burden to challenge capacity and the plaintiff must have a reasonable time to cure any capacity defect. *Id.* at 853 n.7. In *Lovato*, the Texas Supreme Court found that a defect in plaintiff's capacity that was subsequently fixed did not prevent the suit from being properly commenced before the expiration of the statute of limitations. *Id.* at 852–53. The defect in capacity was remedied and the suit "was ultimately represented by a person with capacity" before it was dismissed. *Id.* at 853.

Wilbourn alleges that she brought this suit as "personal representative" of Myers's estate. Pl.'s Compl. ¶¶ 161–62. However, by her own admission, "the administration [of Myers's estate] is currently pending." Pl.'s Resp. at 13. While she assures the Court that she "will seek to promptly complete the administration," Myers' father still has yet to waive any interest in the estate and Wilbourn has not been named the personal representative of Myers's estate. *Id.* In contrast to *Lovato*, where the defect was cured before the case was dismissed, this defect has not been cured yet. 171 S.W.3d at 853. Thus, Wilbourn lacks capacity. Accordingly, Defendant's Motion for Summary Judgment on Wilbourn's survival claims is **GRANTED.**

11

But even if the Court reached the merits of Wilbourn's claims, Summary Judgment would still be proper because she cannot raise an issue of material fact on the causation of Myers's injuries.

## B. Wilbourn has failed to demonstrate a genuine issue of material fact as to the causation element of her claims.

Wilbourn brings four claims against Defendants: (1) wrongful death, (2) negligence, (3) design defect, and (4) failure to warn. Pl.'s Compl. ¶¶ 163, 172, 181, 189–90. Each of these claims require proof of causation. TEX. CIV. PRAC. & REM. CODE §§ 71.002, 82.005; *see Meador v. Apple, Inc.*, 991 F.3d 260, 264–65 (5th Cir. 2018). "Causation for both negligence and products liability therefore turns on whether an alleged cause of an injury may be recognized as a 'substantial factor.'"[4] *Meador*, 991 F.3d at 264. Identifying "a substantial factor is meant to be a 'practical test.'" *Id.* at 265 (quoting *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995)). Defendants' conduct must do more than "furnish the condition that makes the plaintiff's injury possible" and cannot be too remotely connected to the injury. *Union Pump*, 898 S.W.2d at 776. The alleged cause must be a "substantial cause of the event in issue" and a factor "without which the injury would not have occurred." *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007). In certain contexts, such as toxic torts or products liability, causation has two components: "general and specific." *See Merck & Co., Inc. v. Garza*, 347 S.W.3d 256, 262 (Tex. 2011). General causation is whether the product could possibly cause a particular injury and specific causation is whether the product caused a particular person's injury. *Id.*

---

[4]While "proximate cause" is the standard for causation in negligence cases and "producing cause" is the test in products liability, both require "cause in fact;" the only difference between the two standards. is that proximate cause has the additional requirement of "foreseeability." *Meador*, 991 F.3d at 264. For the purposes of this Order, the Court will analyze all claims together under the less demanding "producing cause" standard.

12

Wilbourn alleges that the use of Riddell helmets caused Myers's injuries and death. Pl.'s Compl. ¶¶ 169, 178, 183, 195–96. She claims that Riddell's helmets were defective in protecting against concussions and sub-concussive hits when Myers played football, which led to long-term brain injuries, which led to CTE, which led to Myers's death. *See* Pl.'s Compl. ¶¶ 175–78. To meet her burden, Wilbourn must show that the use of Riddell helmets was a "substantial factor" in Myers's death. *Meader*, 991 F.3d at 264–65. Further, she must present evidence of a genuine issue of material fact that Myers's use of Riddell helmets could, and actually did, cause his CTE. *See Merck*, 347 S.W.3d at 262. Wilbourn supports her claims with the testimony of one expert and two reports concluding that Myers had CTE. *See* Benson Report ¶¶ 34–35; Mez Report, App 82; Huber Report, App 84. However, this record does not support her causal claims.

Dr. Benson's report falls short of providing sufficient evidence to raise a genuine issue of whether Riddell helmets cause long-term brain injuries. Contrary to Wilbourn's assertions, Dr. Benson's report never evaluates the effectiveness of Riddell helmets at preventing brain injuries. *See* Benson Report ¶¶ 30–35. The closest Dr. Benson comes to making any claim about helmet efficacy is that poorly-designed helmet "can lead to increased brain injuries, including CTE." *Id.* ¶ 34. While his report shows that a person who plays football may suffer from brain injuries, it does not address the key question: whether Myers's CTE still would have occurred without the use of Riddell helmets. Benson's report presents no evidence to show that the helmets were a "substantial factor" in Myers's death. Without such evidence, Wilbourn cannot show a dispute of material fact.

The reports of Dr. Mez and Dr. Huber also do not prove any link in Wilbourn's alleged causal chain. In the light most favorable to Wilbourn, their reports show that Myers suffered from CTE,

13

nothing more. Mez Report, App 82; Huber Report, App 84. In fact, Dr. Mez's report weakens Wilbourn's claims, finding that "depression was the primary diagnosis" for Myers's death and that CTE was only "a contributing diagnosis." Mez Report, App 82. This report also lays out extenuating circumstances that worsened Myers's depression: the death of a close cousin and breaking up with his girlfriend. *Id.* Wilbourn's claims rely on the assumption that because Myers suffered from CTE and because he played football, football must have caused his death. Even when taken in conjunction with Dr. Benson's report, these reports fail to raise a genuine dispute on causation of Myers's injury. No other evidence fills the gaps in her cause-and-effect conclusions.

This Court is not the first to face these issues. In *Adams v. BRG Sports, Inc.*, the district court granted summary judgment for Riddell on nearly identical claims because the plaintiffs in that class action failed to meet "their evidentiary burden on general causation regarding their design defect claims." 2021 WL 1517881, at *6. Similarly, in *Archie v. Pop Warner Little Scholars, Inc.*, the Ninth Circuit upheld the lower court's summary judgment because there was "no explanation supporting the logical leap" that football caused the plaintiffs' sons' death by causing their CTE. 2021 WL 4130082, at *2 (9th Cir. Sept. 10, 2021). Like Wilbourn claims here, those plaintiffs' claims lacked proof that the alleged cause was "a *substantial* cause." *Id.* Other courts have also struggled with approving appropriate class action settlements for CTE claims because "clinical study of CTE is in its infancy" and it is difficult to "draw generalizable conclusions" until there are "long-term, longitudinal, prospective epidemiological studies in living subjects." *In re Nat. Football League Players' Concussion Inj. Litig.*, 307 F.R.D. 351, 398–99 (E.D. Pa. Apr. 22. 2015). Thus, while the Court is both deeply sympathetic to Wilbourn's loss and deeply concerned about the health and safety of this country's athletes, based on the law and evidence presented here, the Court

14

is left with no alternative but to hold that Defendants are entitled to summary judgment.[5]

## CONCLUSION

For the foregoing reasons, the Court finds that Defendants' Motion for Summary Judgment should be, and it is hereby, **GRANTED.** Accordingly, Wilbourn's case is **DISMISSED with prejudice.**

**SO ORDERED** on this the **27th day of October, 2021**.

_____
Mark T. Pittman
United States District Judge

---

[5] In reaching this holding, the Court notes its agreement with Judge Edward C. Burks of the Supreme Court of Virginia, who in 1878, writing in an equally heartrending opinion, stated:

> The unhappy condition of the appellee excites my commiseration; but courts of justice are not allowed to be controlled in their decisions by considerations of that character. "Compassion," said an eminent Virginia chancellor, "ought not to influence a judge, in whom, acting officially, apathy is less a vice than sympathy."

*Harris v. Harris*, 72 Va. 31 Gratt. 13, *32 (1878) (quoting Chancellor George Wythe, Commentary on *Field's Ex'x v. Harrison & wife, in* WYTHE'S REPORTS 282 (Minor's Ed. 1794)).